UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X
                                                        :
JOSE ILLESCAS,                                          :         11-CV-5835 (ARR)
                                                        :
                    Petitioner,                         :         NOT FOR ELECTRONIC
                                                        :         OR PRINT PUBLICATION
        -against-                                       :
                                                        :         OPINION AND ORDER
WILLIAM A. LEE, Superintendent, Green Haven             :
Correctional Facility, and ERIC T. SCHNEIDERMAN,        :
New York State Attorney General,                        :
                                                        :
                    Respondents.                        :
                                                        :
------------------------------------------------------------------ X

ROSS, United States District Judge:

    Jose Illescas ("petitioner" or "Illescas"), a prisoner at Green Haven Correctional Facility

in Stormville, NY, petitions this court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

Illescas seeks relief from his 2005 conviction for Manslaughter in the First Degree and sentence

of a determinate term of fifteen years incarceration. He alleges the ineffective assistance of

counsel based on multiple failures by his trial attorney, including: failure to prepare for trial and

research applicable law, failure to prepare petitioner adequately to testify, failure to correct, or

object to, the trial court's decision not to charge a lesser included offense, failure to object to the

court's instruction on self-defense, and failure to request a defense-of-third-person instruction.

The New York courts rejected these claims on direct appeal, and again rejected them after

holding an evidentiary hearing on petitioner's motion to vacate his conviction. Although

counsel's performance in this case left much to be desired, due to the high degree of deference

1

this court must afford to counsel's strategic choices, the petition is denied for the following reasons.

## BACKGROUND

The basic facts of the case are as follows: On January 29, 2004, petitioner, a semi-itinerant Spanish-speaking laborer from Ecuador, went to a building on Stockton Avenue in the Bedford-Stuyvesant section of Brooklyn. At least six homeless men gathered at the building to share a meal. Two of the men, Jose Gutierrez and Benito Martinez, went to bed, while petitioner, Amadore Garcia, and another Ecuadorian man identified only as Miguel, stayed up drinking. Some time after that, Gutierrez and Martinez heard petitioner and the others arguing outside. They then heard between one and three loud bangs and went outside. There, petitioner was seen standing over Garcia holding a shovel. Garcia was lying on the ground bleeding from his head. Petitioner threw the shovel onto Garcia's chest, and he and Miguel fled. Petitioner was arrested shortly thereafter, while, according to the state court record, Miguel was never found.

I.      *Trial*

Petitioner was tried in Supreme Court, Kings County, on four counts of homicide: second degree intentional murder, second degree depraved indifference murder, first degree manslaughter, and second degree manslaughter. See generally Trial tr. (hereinafter "Tr.").[1]  At a

---

[1] All of these counts apply when the defendant causes the death of another person; the difference between the counts relates to the defendant's state of mind when he causes the death: A defendant commits second degree intentional murder when he intends to kill. N.Y. Penal L. § 125.25(1). A defendant commits depraved indifference murder when, under "circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which creates a grave risk of death." Id. § 125.25(2). A defendant commits first degree manslaughter when he intends to cause serious physical injury. Id. § 125.20(1). A defendant commits second degree manslaughter when he recklessly causes the death of another. Id. § 125.15(1).

pre-trial hearing, the trial court suppressed a videotape of a statement by petitioner, based on the fact that petitioner repeatedly invoked his right to silence in an interview with law enforcement officials. Hr'g tr. 101. Trial commenced on September 27, 2005. Tr. 1. In his opening argument, defense counsel stated, "[T]here is simply not enough evidence to convict Mr. Illescas." Id. 21. He went on to argue, "The People have a bad case. They have arrested the wrong person. This is a case of perceptions, observations and identity, and you're going to see . . . [the People] can't prove, as they are obliged to do, Mr. Illescas guilty beyond a reasonable doubt." Id.

      a.     The People's Case

The People's case began with several detectives and police officers who investigated the crime. Id. 21-189. Detective Horace J. Wright testified about finding Garcia's body in the back lot behind the building on Stockton Street, id. 41, and described a large pool of blood around Garcia's head and a spray pattern of blood on two nearby metal tanks, id. 46. On cross-examination, defense counsel asked Det. Wright if the blood was tested in any way. Id. 83. Det. Wright said it was not. Id. Over objections from the prosecutor, defense counsel asked Det. Wright repeatedly whether he had definitive knowledge that the substance was blood, suggesting instead that "it could be red paint." Id. 84-88, 91-92.

Following the police investigators' testimony, the People called Gutierrez. Id. 195. He testified that he was lying in bed, id. 206, while the two Ecuadorians, Illescas and Miguel, were arguing with Garcia outside, id. 203-04. Gutierrez then heard a bang. Id. 205. He testified that he then saw Illescas throw a shovel across the middle of Garcia's body while saying, "[G]o to hell." Id. Illescas then said, "[L]et's go, let's go, it's done," and he and Miguel fled. Id. 206.

After Martinez lit a match, Gutierrez was able to see that Garcia's "head was completely all broken up and you could see the brain." Id. 209. Garcia had no weapon in his hands. Id. 217. Gutierrez flagged down passing firefighters who called the police. Id. 210. He then identified and led the police to petitioner. Id. 211-12.

On cross-examination, Gutierrez clarified that he did not see either petitioner or Miguel actually strike Garcia with the shovel; he only saw Garcia falling down and Illescas throw the shovel toward him. Id. 217, 236, 239. Gutierrez also testified that he told the police where Miguel lived and worked, but to his knowledge, Miguel had left his workplace when the police went there, and he had not seen Miguel since the night of the killing (nor had the police asked him further about Miguel). Id. 238.

The People next called Martinez. Id. 251. He testified that he was asleep and was woken up by the sounds of an argument between petitioner, Garcia, and Miguel. Id. 256-57. He then heard three "bang noises." Id. 257. He then got up, went outside, and saw Garcia lying on the ground. Id. 258-59. He heard sounds coming from Garcia "like agonizing." Id. 259. Martinez stated that he then got Gutierrez out of bed and the two of them went to get help. Id. 259-60. On cross-examination, Martinez testified that he, too, did not see who hit Garcia, and also did not see who put the shovel on top of him. Id. 268-69. He reiterated that Gutierrez was in bed when Martinez first went out and saw Garcia lying on the ground. Id.

b.    Petitioner's Testimony

After testimony by a medical examiner (who testified that Garcia was struck in the head "about eight times," id. 301), the People rested, id. 313. Defense counsel then stated:

I discussed with Mr. Illescas various defenses on this on prior occasions. I have discussed the aspect of his taking the stand and the degree of exposure he may have in the event he does take the stand and is cross-examined by the District Attorney's office.

I also explained to him not only does the District Attorney have a right to cross-examine him based on the questions from the District Attorney's office, they would also have a right to question him with regard to the formerly suppressed tape, and possibly from the statement that he's made. . . .

I also discussed with him whether or not to take the stand, what would happen with regard to if he did take the stand. He advised me that he does in fact want to take the stand in his own behalf.

Id. 315. The court then explained the possibility that if petitioner made statements on the stand that were inconsistent with statements he made prior to trial, that would open the door to the introduction of the prior statements that had been suppressed. Id. 316. The court asked petitioner if it was his desire to testify, to which he responded, "Yes." Id.

Petitioner then took the stand. Id. 317. He testified that he and the other men were drinking beer and then Garcia "somehow got kind of crazy" and told Illescas to leave. Id. 327. Petitioner stated, "I was just sitting there, and he grabbed me and slammed me on the floor. Then I grabbed his hair and he grabbed my neck." Id. As petitioner was trying to leave, Garcia hit him with a shovel on the left side of his body. Id. at 327-28. Petitioner then grabbed a piece of wood from the ground and threw it at Garcia. Id. 328. He testified he could not see whether the wood hit Garcia because it was dark. Id. He then left. Id. Defense counsel asked, "And can you tell us about what time that was?" Id. Petitioner replied, "No. I didn't have a watch." Id.

On cross-examination, the assistant district attorney impeached petitioner by showing a picture of his mug shot taken the next night, in which petitioner was wearing a watch. Id. 331. Petitioner said he had received that watch in exchange for food from another person in the jail. Id. 331, 340-42. Petitioner also denied ever talking to detectives about what happened with

5

Garcia. Id. 346. As a result of that statement, the court permitted the People to introduce the previously-suppressed video to impeach petitioner insofar as the video showed that he had spoken to detectives prior to speaking to the assistant district attorney. Id. 360. The video was later played over defense counsel's continuing objection. Id. 376-77.[2]

    c.    <u>Charge Conference</u>

Following petitioner's testimony, the court held a charge conference. Id. 396. The court proposed to define in its charge Murder in the Second Degree, intentional murder; Murder in the Second Degree, depraved indifference murder; Manslaughter in the First Degree; and Manslaughter in the Second Degree. Id. 398. The People informed the court that it was not requesting a charge on depraved indifference murder because the facts would not support it. Id. 399. Defense counsel concurred and added, "I would ask that Manslaughter in the First Degree, likewise, not be included." Id. The court agreed to grant the application not to charge depraved indifference murder, and added,

> Coupled with that application I think would be an application dealing with
> Manslaughter in the Second Degree. . . . [I]f you are going to move to dismiss the

---

[2]The transcript of the videotape is not in the state court record, but petitioner represents the "substance" of the tape in his memorandum of law as follows:

> Garcia, who was drinking and angry at Illescas, grabbed him by the neck, dragged
> him, told him to leave the house, and repeatedly threatened to kill him. As
> Illescas was leaving after Garcia let go of him, Garcia swung a shovel at his head;
> Illescas ducked, and the shovel hit him in the back. Illescas stated that another
> man, from Ecuador, came outside where he and Garcia were and that Garcia was
> going to hit the other man with the shovel. Illescas picked up a stick and threw it
> at Garcia, hitting him; when asked where the stick hit Garcia, Illescas gestured
> from his shoulders up to his head. He said that because it was dark, he did not see
> if Garcia fell. . . . Illescas then left the area.

Pet'r's Mem. of Law 14.

count of murder two, depraved indifference, I can't see a reasonable view of the evidence to include man[slaughter] two. I think that would be inconsistent with this charge as depraved indifference.

Id. 400.[3] Defense counsel did not object. The court then asked defense counsel, "Do you consent? Do you want me to charge depraved indifference and man two?" Id. 401. Defense counsel replied, "No, sir." Id. Defense counsel then requested a justification charge and a missing witness charge. Id. at 401, 404-05. The court agreed to charge justification, id. 404; however, as defense counsel was unable to articulate how the evidence met the relevant standards for a missing witness charge, the court denied that application, id. 405-09. Defense counsel noted an exception. Id. 409. Finally, the court said to defense counsel, "I will hear you with respect to Manslaughter in the First Degree. I will just suggest to you that it's the Court's position that a reasonable view of this evidence would support . . . Manslaughter in the First Degree." Id. Defense counsel responded, "I don't have any objection. I withdraw my application." Id. 410.

    d.    <u>Defense Counsel's Summation</u>

Defense counsel's closing focused on the People's burden and argued the jury could not convict based on speculation about whether petitioner "could have done it or might have done it." Id. 416. Counsel argued that the jury was being "asked based upon the faith you have in the

---

[3]This ruling was error under well-established New York law. As noted above, depraved indifference murder and second degree manslaughter both have a mental element of recklessness; however, second degree murder is also a lesser included offense of second degree <u>intentional</u> murder because both crimes require the same act, but the latter has a higher mental state. <u>See</u> People v. Green, 56 N.Y.2d 427, 429 (1982) ("A crime which as defined by the Penal Law includes as an element defendant's mental state can be a lesser included offense of a crime the definition of which requires the same act but a higher mental state, but cannot be a lesser included offense of a crime in the definition of which mental state plays no part.").

People to believe that this is blood [on the shovel]." Id. 418. He argued, "They didn't even conduct a blood test, no DNA test. It's outrageous. It's literally outrageous." Id. 420. Defense counsel then went on to attack Gutierrez's credibility based on inconsistencies in his testimony. Id. 422-29. Counsel stated, "Once again you're being asked to convict Mr. Illescas based on the testimony basically of two witnesses who really didn't see anything." Id. 429. Defense counsel then urged the jury to credit petitioner's testimony, including petitioner's claim that he traded food for the watch while in jail. Id. 429-32. Counsel concluded as follows:

> Once again, it's not whether Mr. Illescas could have done it, should have done it, or might have done it. It's whether or not the People, the District Attorney's Office, has proven him guilty beyond a reasonable doubt. And you know, ladies and gentlemen, they know they haven't and you know they haven't.

Id. 433. Besides a general argument that petitioner's testimony was credible, however, defense counsel did not mention self-defense in his summation.

      e.    Charge, Jury Questions, and Verdict :

In its charge to the jury, the court instructed that the burden was on the People to prove, beyond a reasonable doubt, that petitioner's use of force was not justified. Id. 479-80, 484. Defense counsel made no objection to the court's charge. Id. 488.

The jury deliberated for four days. Id. 491-520. They requested the physical evidence, id. 491-92, and to have the testimony of Gutierrez and Martinez read back to them, id. 501-02, 508. On the second day of deliberation, the jury sent a note to the court with the question, "Would it be possible to seek a lesser charge[?]" Id. 498. Defense counsel advised that the answer should be no, id., and the court answered the jury, "no," id. 500. On the fourth day of deliberation, the jury asked to have the elements of Manslaughter in the First Degree repeated, id. 508, and later

that day, they returned a verdict of not guilty on intentional murder and guilty on Manslaughter in the First Degree, id. 520-21. At a subsequent sentencing hearing, the court sentenced petitioner to a determinate term of twenty-two years in prison. Sentencing Hr'g Tr. 11.

II. *Post-Trial Proceedings*

Petitioner raised a claim of ineffective assistance of counsel on his direct appeal; however, the Appellate Division affirmed his conviction, holding he was not deprived of meaningful representation. People v. Illescas, 849 N.Y.S.2d 165, 165 (App. Div. 2008). Nevertheless, the Appellate Division found the sentence to be excessive and reduced it to fifteen years. Id.

Petitioner then filed a motion pursuant to N.Y. Crim. Proc. L. § 440.10 reasserting his ineffective assistance of counsel claims. On April 27, 2010, the Supreme Court of Kings County held a hearing on petitioner's motion, at which appellate counsel examined trial counsel on his performance. See Pet'r's Mem. of Law. A20. At the hearing, trial counsel conceded that he had no legal research in his file regarding the lesser included offenses. Id. A27. Trial counsel suggested the reason he did not seek a charge of Manslaughter in the Second Degree was because he was pursuing a justification defense. Id. A33. He stated, "[I]n asking for a man two, you're subjecting your client to potential incarceration where justification would have meant that he would have been exonerated completely." Id. Appellate counsel asked whether it was trial counsel's understanding that second-degree manslaughter could be a lesser included offense of intentional murder. Id. A34. Trial counsel responded that it depended on the judge. Id. When asked why, if he was pursuing full acquittal, he would consent to first degree manslaughter being

charged, trial counsel responded, "I think, for the most part, the transcript speaks for itself. I don't know what I was thinking at that point." Id. A39-A40.

The Supreme Court denied petitioner's § 440.10 motion on July 1, 2010, Dkt. #1, at 27, and on August 23, 2011, the Appellate Division affirmed, People v. Illescas, 928 N.Y.S.2d 762, 763 (App. Div. 2011). The Appellate Division cited People v. Satterfield, 488 N.E.2d 834 (N.Y. 1985), for the proposition that "counsel's subjective reasons for a decision are immaterial, so long as [v]iewed objectively, the transcript and the submissions reveal the existence of a trial strategy that might well have been pursued by a reasonably competent attorney." Illescas, 928 N.Y.S.2d at 763 (alteration in original) (internal quotation marks omitted). The court then held:

> Here, a reasonable view of the evidence shows that the conduct relating to the subject homicide was intentional, not reckless. Trial counsel availed himself of a justification defense strategy. Consistent therewith, trial counsel's choice not to request submission of the lesser-included offense of manslaughter in the second degree, with its mens rea of recklessness, constituted a legitimate trial strategy of a reasonably competent attorney.

Id. (internal citations omitted). The Court of Appeals denied leave to appeal on November 18, 2011, Dkt. #1, at 30.

The instant petition was timely filed on November 30, 2011, see Dkt. #1. Petitioner argues that trial counsel was ineffective because he (1) failed to prepare for trial and research applicable law regarding the lesser included offense of second degree manslaughter; (2) failed to correct, or object to, the trial court's decision not to charge second degree manslaughter; (3) failed to prepare petitioner adequately to testify; (4) failed to object to the court's instruction on self-defense, and (5) failed to request a defense-of-third-person instruction.

**DISCUSSION**

I.  *Standard of Review*

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") established a deferential standard that federal habeas courts must apply when reviewing state court convictions. 28 U.S.C. § 2254(d). The statute provides, in pertinent part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States . . . .
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Id.

The phrase "clearly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412 (2000). A state court decision is "contrary to" clearly established Supreme Court precedent if "the state court applies a rule that contradicts" Supreme Court precedent or if "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent." Id. at 405-06. With respect to the "unreasonable application" clause, "a federal habeas court . . . should ask whether the state court's application of clearly established federal law was objectively unreasonable." Id.

at 409.  "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief."  Harrington v. Richter, --- U.S. ---, 131 S. Ct. 770, 784 (2011).

II.  *Ineffective Assistance of Counsel*

A petitioner seeking a writ of habeas corpus on ineffective assistance of counsel grounds faces a heavy burden in establishing entitlement to relief.  Strickland v. Washington, 466 U.S. 668 (1984), established the two-prong test by which ineffective assistance of counsel claims are adjudicated.  Under Strickland, a petitioner must demonstrate, first, that counsel's performance fell below "an objective standard of reasonableness" under "prevailing professional norms," id. at 688, and second, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A court need not decide both prongs of the Strickland test if the showing on one is insufficient.  See id. at 697.

In analyzing a claim that counsel's performance fell short of constitutional standards, the court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . [and] might be considered sound trial strategy."  Id. at 689 (internal quotation marks omitted).  In so doing, it must "affirmatively entertain the range of possible reasons [petitioner]'s counsel may have had for proceeding as they did."  Cullen v. Pinholster, --- U.S. ---, 131 S. Ct. 1388, 1407 (2011) (citation and internal quotation marks omitted).

Moreover, when ineffective assistance of counsel claims are presented on collateral habeas review, the court assesses them subject to the strictures of AEDPA and must be "doubly deferential" in reviewing the state court's determination that counsel acted effectively.  Knowles

v. Mirzayance, 556 U.S. 111, 123 (2009) (citing Yarborough v. Gentry, 540 U.S. 1, 5-6 (2003) (per curiam)); see 28 U.S.C. § 2254(d). To prevail on an ineffective assistance of counsel claim on habeas review, a petitioner must show not only that counsel's performance fell below the Strickland standard but also that the state court's adjudication of the Strickland standard was itself unreasonable. See Richter, 131 S. Ct. at 785. Stated differently, the court may afford habeas relief only upon a finding that the state court was unreasonable—and not merely incorrect—in concluding that counsel's performance did not fall below an objective standard of reasonableness or that petitioner was not prejudiced. See id.

III.   *Petitioner's Claims*

   a.   Contrary to Clearly Established Federal Law

Petitioner argues first that the Appellate Division's reliance on the standard articulated in Satterfield, 488 N.E.2d at 834 – namely, that counsel's subjective reasons for a decision are immaterial, so long as an objective view of the record reveals a reasonable strategy – was contrary to Strickland. As support, petitioner cites a footnote from a district court opinion stating, "Under Strickland, the question is not whether a hypothetical, reasonably competent attorney may have made the strategic decision to forego a potentially meritorious suppression motion; it is whether trial counsel actually investigated and made such a strategic decision." Lopez v. Greiner, 323 F. Supp. 2d 456, 477 n.13 (S.D.N.Y. 2004) (citing Kimmelman v. Morrison, 477 U.S. 365, 384-85 (1986)). This argument also finds some support in Strickland itself. For example, the Strickland Court held, "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's

13

perspective at the time." 466 U.S. at 689 (emphasis added). Evaluating reasonableness from "counsel's perspective" might be read to suggest some consideration of counsel's subjective reasons for his particular decision may be appropriate.

However, Strickland also explicitly requires the court to apply an "objective standard of reasonableness" to counsel's performance. 466 U.S. at 688 (emphasis added). Accordingly, some courts have interpreted this objective standard to require a petitioner to establish not just that his counsel took a given action in the absence of a strategy, but that "no competent counsel would have taken the action that his counsel did take." Hammond v. Hall, 586 F.3d 1289, 1332 (11th Cir. 2009) (internal quotation marks omitted). If that is correct, counsel's state of mind is irrelevant so long as the court can think of a reason that competent counsel might make the same decision. The Supreme Court has recently approved this type of objective approach as consistent with Strickland, holding:

> Although courts may not indulge "post hoc rationalization" for counsel's decisionmaking that contradicts the available evidence of counsel's actions, neither may they insist counsel confirm every aspect of the strategic basis for his or her actions. There is a "strong presumption" that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than "sheer neglect." After an adverse verdict at trial even the most experienced counsel may find it difficult to resist asking whether a different strategy might have been better, and, in the course of that reflection, to magnify their own responsibility for an unfavorable outcome. Strickland, however, calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind.

Richter, 131 S. Ct. at 790 (emphasis added) (internal citations omitted); accord Pinholster, 131 S. Ct. at 1407.

Richter involved a failure of counsel to introduce expert testimony to counter the prosecution's blood pattern evidence, 131 S. Ct. at 782, while Pinholster involved failure to

14

investigate and present mitigating evidence of mental disorders, 131 S. Ct. at 1396. Thus, these cases involved matters that clearly fit in the traditional category of counsel's tactical choices. See United States v. Yanishefsky, 500 F.2d 1327, 1332 (2d Cir. 1974) ("The selection of witnesses is clearly a matter of trial strategy, which the courts are extremely reluctant to second-guess.") (internal citations omitted). It is yet unclear whether the Court's prohibition on inquiry into counsel's subjective state of mind would extend to scenarios in which counsel was ignorant of the law or failed to conduct even minimal legal research. Cf. Cox v. Donnelly, 432 F.3d 388, 390 (2d Cir. 2005) (per curiam) (counsel held ineffective where, inter alia, "he did not challenge the trial court's intent instructions because he did not then know that they were illegal under state and federal law"); Flores v. Demskie, 215 F.3d 293, 304 (2d Cir. 2000) (counsel's performance was unreasonable where counsel waived a potential Rosario claim and "[t]he only basis for this waiver was counsel's misunderstanding of Rosario"). Nevertheless, even assuming the latter scenario applies here, if federal law is unclear, this court must defer to the state court's application of federal law. See Lockyer v. Andrade, 538 U.S. 63, 72 (2003) (federal law is not "clearly established" where Supreme Court holdings do not "establish[] a clear or consistent path for courts to follow"). Accordingly, because the question of whether or not counsel's subjective state of mind is material to a Strickland claim is, at best, left unclear by the Supreme Court's precedents, this court cannot say that the Appellate Division's standard was contrary to "clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1). Petitioner's first argument therefore fails.

b.      Unreasonable Application of the Law/Unreasonable Determination of the Facts

Petitioner also argues that the Appellate Division made an unreasonable determination of the facts when it found that "counsel availed himself of a justification defense strategy." Illescas, 928 N.Y.S.2d at 763. Petitioner points to the fact that (1) counsel made no argument about justification in his summation, and (2) he acquiesced to the trial court's instruction on Manslaughter in the First Degree (intent to cause serious physical injury), thus undermining any argument that counsel was pursuing an "all-or-nothing" justification defense. Pet'r's Mem. of Law 60. Respondent argues that the trial record shows counsel did not want a charge on first degree manslaughter, as he requested that it "likewise, not be included," see Tr. 399. Mem. of Law 11-12. Respondent argues counsel withdrew his objection only when he determined it would be fruitless to object, since the trial court had "already determinated, on its own, to submit the lesser included offense." Id. 12. However, counsel knew how to note an exception for the record, see, e.g., Tr. 176, 358, 409, and here stated, "I don't have any objection," id. 410.

Moreover, this court's review of the transcript reveals that counsel's strategy was not a justification defense. Throughout the trial, counsel sought to poke holes in the prosecution's case, and only requested a justification charge based on petitioner's inconsistent, largely self-defeating testimony. At most, the justification "strategy" was an ad hoc addition to what was otherwise a strategy of pointing out grounds for reasonable doubt. The Appellate Division's determination that trial counsel's strategy was instead one of justification was based on trial counsel's post hoc rationalizations at the hearing on the § 440.10 motion. Accordingly, its determination was unreasonable in light of the record.

But even unfettered by the demanding deference required by 28 U.S.C. § 2254(d), petitioner still cannot establish ineffective assistance of counsel. This is because on de novo review, the court still must defer to counsel's strategic choices. Richter, 131 S. Ct. at 790. Here, it was perfectly sound strategy to pursue a defense relying on the reasonable doubt standard. No one saw petitioner deal the fatal blows to Garcia. Although Gutierrez testified he saw petitioner throw the shovel at Garcia and say "go to hell," Martinez's testimony called into question whether Gutierrez had, in fact, seen anything before petitioner fled the scene. Tr. 268-69. The undisputed presence of Miguel at the crime and his subsequent flight from his job made him a potential alternative suspect. Id. 238. Counsel argued this very point in his opening statement, saying, "They have arrested the wrong person." Id. 21. He concluded his summation by arguing, "[I]t's not whether Mr. Illescas could have done it, should have done it, or might have done it. It's whether or not the People, the District Attorney's Office, has proven him guilty beyond a reasonable doubt." Id. 433. These arguments are consistent with a reasonable doubt strategy. Unquestionably, counsel blundered along the way: the argument that the blood around Garcia's head could be red paint, for example, did not win credibility for the defense. But even a poorly executed strategy is insufficient to overcome the presumption this court must afford, that counsel "made all significant decisions in the exercise of reasonable professional judgment." Strickland, 466 U.S. at 690.

Because trial counsel's strategy was reasonable, it was reasonable for him to pursue full acquittal based on reasonable doubt rather than seek a conviction on a lesser included offense. See Black v. Goord, 419 F. Supp. 2d 365, 381-82 (W.D.N.Y. 2006) (where counsel presented defense of misidentification, i.e. "that someone else committed the murder," failure to request

17

lesser included offense charge was not unreasonable); Otero v. Eisenschmidt, No. 01 Civ.2562HB AJP, 2004 WL 2504382, at *33 (S.D.N.Y. Nov. 8, 2004) (a strategy that denies guilt is "a strategy that practically precludes a request for an instruction on a lesser included offense") (internal quotation marks omitted); Smith v. Walsh, No. 02 Civ. 5755(WHP(JCF, 2003 WL 21649485 at *7 (S.D.N.Y. July 14, 2003) (finding counsel not ineffective for failing to request charge on lesser included offense because such a charge "would have undermined counsel's strategy of seeking an acquittal"); Domingo v. Greiner, No. 99 Civ. 1906(JSM), 2002 WL 362761, at *2 (S.D.N.Y. Mar. 5 2002) ("While with hindsight, counsel's decision not to seek a lesser included offense charge did not prove successful, his decision not to give the jury an option that could result in a compromise verdict was not unreasonable."). If anything, counsel's major error in pursuing this strategy was failing to object to the charge of first degree manslaughter. But this proved to be a fortuitous mistake since the jury convicted on the lesser offense. Had counsel succeeded in excluding all lesser included offenses, it is possible that petitioner might have been fully acquitted. But the risk of an all-or-nothing defense is that the jury might instead have convicted petitioner of intentional murder.

Finally, it is tempting, given the jury's question about seeking a lesser charge, to infer that the jury would have convicted petitioner of second degree (reckless) manslaughter if given the chance. Assuming such an inference is correct, this fact goes to prejudice, not the reasonableness of counsel's decision. While the jury's question may suggest, in hindsight, that a different strategy could have yielded a different outcome, in assessing counsel's performance, Strickland requires the court to "eliminate the distorting effects of hindsight." Strickland, 466 U.S. at 689. Reasonably competent counsel could have determined that although the evidence adduced at trial

18

might support a conviction for second degree manslaughter, it was not likely that the jury would convict on this charge, rather than acquit altogether. The jury's question about a lesser charge, therefore, does not rebut the presumption that counsel's strategy was objectively reasonable. Petitioner's claim of ineffectiveness based on the failure to seek the lesser included offense of second degree manslaughter is accordingly without merit.

Petitioner's additional arguments that counsel was ineffective are also without merit:

First, with respect to counsel's alleged failure to prepare petitioner to testify: The record plainly demonstrates that trial counsel advised petitioner not to testify and warned him of the dangers inherent in doing so. Tr. 315; Pet'r's Mem. of Law. A62. Petitioner elected to testify despite this advice. Id. Counsel can hardly be faulted for counseling petitioner – correctly – that testifying was likely only to hurt his case. Moreover, even assuming counsel was somehow deficient, any error did not prejudice petitioner. While petitioner's testimony certainly damaged his credibility, the testimony and subsequent admission of the videotaped statement did not actually contradict or otherwise undermine the defense theory of the case; namely, that Illescas was involved in a fight with Garcia, but there was insufficient proof that he killed Garcia. Therefore, although Illescas's testimony was contradictory and perhaps foolhardy, there is no reasonable probability that, if counsel had "prepared" him, the outcome of the case would have been different.

Second, with respect to counsel's failure to correct the court's self-defense instruction: The instruction was not a model of clarity. However, it did inform the jury that the burden was on the People to prove absence of justification beyond a reasonable doubt, Tr. 479-80, and that if they failed to find proof of an absence of justification with respect to any charge, they must find

19

petitioner not guilty, id. 484. Petitioner argues that counsel should have asked the court to instruct the jury to stop deliberating if it found justification in its consideration of the first count. Pet'r's Mem. of Law 61. But the court's instructions properly informed the jury that it must consider lack of justification as an element of each offense. Thus, had the jury credited petitioner's justification defense, it would have acquitted him fully with or without an instruction to stop deliberating. Counsel's failure to object therefore produced no prejudice.

Finally, with respect to counsel's failure to request a defense-of-third-person instruction: The only evidence at trial supporting a charge on defense of a third person was from the videotape of petitioner's statement. Pet'r's Mem. of Law 14. Petitioner never mentioned it in his testimony, nor did any other witness testify as to any facts that would support such a defense. Even if an instruction on defense of a third person were warranted based on this thin evidentiary record, there is no reasonable probability that the jury, which rejected petitioner's self-defense claim, would have credited a justification defense based on defense of a third person. Accordingly, petitioner cannot establish prejudice on this claim.

# CONCLUSION

For the foregoing reasons, the petition is denied. As petitioner has failed to make a substantial showing of the denial of a constitutional right, a certificate of appealability is denied. 28 U.S.C. § 2253(c)(2). However, in forma pauperis status is granted for purposes of an appeal. The Clerk of the Court is directed to enter judgment accordingly and close the case.

SO ORDERED.

s/Allyne R. Ross

Allyne R. Ross.
United States District Judge

Dated: March 22, 2013
      Brooklyn, New York